[Cite as *State v. Parker*, 2015-Ohio-4495.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 102389**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**DONALD PARKER**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-586410-A

**BEFORE:** Blackmon, J., Kilbane, P.J., and Boyle, J.

**RELEASED AND JOURNALIZED:** October 29, 2015

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
700 W. St. Clair
Suite 212
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Kristin Karkutt
        John D. Kirkland
Assistant County Prosecutors
9th Floor Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

PATRICIA ANN BLACKMON, J.:

{¶1}   Donald Parker ("Parker") appeals his convictions for aggravated murder, murder, aggravated burglary, felonious assault, and carrying a concealed weapon.  Parker assigns six errors for our review.[1]

{¶2}   Having reviewed the record and pertinent law, we affirm.  The apposite facts follow.

## Facts

{¶3}   In late May 2014, Parker and his on-again, off-again girlfriend of four years, Barbara Suttles ("Suttles"), broke up.  Parker moved out of the house on W. 46th Street, in Cleveland, that he was sharing with Suttles, Suttles's 15-year-old son, and an otherwise homeless man named William Brown.  Immediately after Parker moved out, Suttles began dating Gabriel Payne ("the victim"), although she and Parker continued to talk on the telephone.

{¶4}   On June 9, 2014, the victim asked Suttles to stop talking to Parker.  In turn, Suttles told Parker over the phone that she was "moving on" and that she "would not allow him over to the house."  Suttles and Parker exchanged 17 phone calls on June 9, 2014.  During a phone call at 10:10 p.m., Suttles told Parker that the victim was on his way to her house and Parker was not welcome there anymore.  Parker told Suttles he was coming over and that he "got something for [the victim's] ass."  After this, Suttles fell asleep.

{¶5}   At approximately 10:30 p.m., the victim arrived at Suttles's home and began watching television with Suttles's son and Brown.  Shortly before 1:30 a.m. on June 10, 2014, Parker "burst in" through the door of Suttles's home "like he lived there."  The victim told Parker

---

[1]*See* appendix.

to "get the fuck out." Parker did not leave, and according to Suttles's son, the victim "jumped up and pushed [Parker] out of the door."

{¶6}   Suttles's son ran upstairs to tell his mom that there was fighting going on downstairs.   Suttles remained in bed.   Suttles's son went outside and saw Parker and the victim on the ground fighting.

{¶7}   Brown walked outside to find Parker and the victim "in the front yard tussling." Brown tried to separate the two but "got shoved back."   At that point, a knife "went flying past" him, and Brown "tossed it inside the house."   Parker got up and walked down the street.   Brown helped the victim back into the house, as the victim was holding his stomach and saying "He stabbed me, he stabbed me."   Brown called 911.

{¶8}   Suttles's son went into Suttles's bedroom a second time "panicking and screaming that [the victim] had got hurt."   Suttles ran downstairs and saw the victim on her couch coughing, breathing heavy, sweating, and bleeding from his stomach.   She also saw a butcher knife with a white handle on the floor at the foot of the couch.   Suttles had never seen this knife before. Suttles put the knife in the kitchen sink so nobody else "got hurt with it."   Suttles, who suffers from panic attacks, kissed Payne on the forehead and told him she would see him at the hospital. Suttles then went back upstairs to sleep.

{¶9}   The police and EMS arrived on the scene at 1:37 a.m. on June 10, 2014.   The victim was taken to the hospital and pronounced dead at 2:45 a.m.   The cause of death was multiple stab wounds.

{¶10} On June 24, 2014, Parker was charged with the following offenses: aggravated murder in violation of R.C. 2903.01(A); aggravated murder in violation of R.C. 2903.01(B); murder in violation R.C. 2903.02(B); felonious assault in violation of R.C. 2903.11(A)(1); felonious assault in violation of R.C. 2903.11(A)(2); aggravated burglary in violation of R.C.

2911.11(A)((1); aggravated burglary in violation of R.C. 2911.11(A)(2); and carrying a concealed weapon in violation of R.C. 2923.12(A)(1).

{¶11} On November 20, 2014, after a bench trial, the court found Parker guilty of murder in violation of R.C. 2903.02(A) as a lesser included offense of aggravated murder under Count 1 of the indictment. The court additionally found Parker guilty of all other offenses, and on December 11, 2014, sentenced him to life in prison with parole eligibility after serving 20 years.

## Sufficiency of the Evidence

{¶12} In the first assigned error, Parker argues that the state presented insufficient evidence to show that he committed murder under R.C. 2903.01(B) during an aggravated burglary in violation of R.C. 2911.11(A).

{¶13} Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the prosecution's evidence is insufficient to sustain a conviction for the offense. Crim.R. 29(A) and sufficiency of the evidence require the same analysis. *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134.

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Driggins*, 8th Dist. Cuyahoga No. 98073, 2012-Ohio-5287, ¶ 101, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶14} Revised Code 2903.01(B) states in pertinent part as follows: "No person shall purposely cause the death of another * * * while committing or attempting to commit * * * aggravated burglary * * *."

{¶15} Aggravated burglary is defined in part as follows: "No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person * * * is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply: (1) The offender inflicts * * * physical harm on another; (2) The offender has a deadly weapon * * * on or about the offender's person or under the offender's control." R.C. 2911.11(A).

{¶16} Reading these statutes together, Parker was convicted of felony murder predicated on aggravated burglary. Parker argues on appeal that there is no evidence that he planned or intended to commit a criminal act at Suttles's house.

{¶17} Parker testified on his own behalf at the bench trial. According to Parker, Suttles told him not to come to her house on the night of June 9, 2014, because the victim was going to be there. Parker, who drank at least ten 24-ounce beers and two other alcoholic beverages that afternoon and night, called Suttles's cell phone at 1:09 and 1:21 a.m. on June 10, 2014. Parker testified that the victim answered Suttles's phone and said, "Why don't you come over so I could whoop your white honky ass?" Parker grabbed a 13" butcher knife with a white handle, put it in his belt loops, and walked approximately 1/4 mile to Suttles's house.

{¶18} Asked why he went to Suttles's house, Parker testified that he wanted to "confront" the victim, he "didn't want to look like a pussy," and he would get more respect if he showed up. Asked why he carried a knife to Suttles's house, Parker testified that it was "for protection * * * from [the victim]." Asked if he knew that "somebody could get stabbed if you brought a knife over there," Parker stated, "Well, yeah, yes. * * * I was afraid of what [the victim] was going to do when I showed up."

{¶19} Parker testified that when he arrived at Suttles's house, he "just walked in like I lived there," went into the living room, and told the victim to come outside. Parker was angry and nervous, but he wanted the victim to go outside because Parker did not want Suttles's son and

Brown involved. Asked what he meant by that, Parker testified as follows: "I just wanted [the victim] outside just in case something did happen."

{¶20} According to Parker, the victim grabbed him and started pushing him backward out of the front door. Parker and the victim fell down the front steps. Parker testified about the events that took place next: "Once I hit the ground, the knife fell out of my belt loops. * * * [The victim] grabbed the knife and then [the victim] started getting on top of me with the knife." Parker testified that he "grabbed the knife by the blade and tried to take it back from the victim. * * * I wrenched the knife out of [the victim's] hand, then I struck him in the stomach, and I started waving the knife around. He was still trying to grab the knife out of my hand. * * * I began side swinging at him around his shoulder area." Subsequently, Parker pushed the victim off of him, dropped the knife, ran down the street, and called 911.

{¶21} Upon review of Parker's testimony alone, we find that the state put forth sufficient evidence to show murder in violation of R.C. 2903.01(B) and aggravated burglary in violation of R.C. 2911.11(A). Carrying a concealed butcher knife into a house uninvited to "confront" your ex-girlfriend's current boyfriend is sufficient to show that you trespassed by force into an occupied structure with purpose to commit a criminal offense while carrying a deadly weapon. *See also State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 37 ("the due process 'sufficient evidence' guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime"). (Citation omitted.)

{¶22} Accordingly, Parker's first assigned error is overruled.

**Manifest Weight of the Evidence**

{¶23} In the second assigned error, Parker argues that his convictions are against the manifest weight of the evidence.

{¶24} In *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, the Ohio Supreme Court addressed the standard of review for a criminal manifest weight challenge:

> [T]he appellate court sits as the "thirteenth juror" and * * *, reviewing the entire record, weighs all the reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

{¶25} However, an appellate court may not merely substitute its view for that of the trier of fact, as deference is given to determinations of witness credibility made during trial. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).

{¶26} In the case at hand, Parker admitted to stabbing the victim, but claimed he did it in self-defense. The evidence in the record shows that Parker had deep cuts across the inside of his fingers near where they meet his palm. Testimony was presented that these cuts are consistent with grabbing the blade of, and being sliced by, a knife. According to Parker, he grabbed the knife by the blade to get it away from the victim but ended up stabbing the victim. Parker testified that, "In my mind at that point I was scared for my life. * * * I had the blade in my hand and struck him five times."

{¶27} A DNA analyst from the Cuyahoga County Medical Examiner's Office testified that there was a mixture of DNA found on the handle of the knife used to stab the victim. Parker cannot be excluded as a contributor to this DNA, results are inconclusive as to Brown and Suttles's DNA, and the victim "is excluded as a contributor to this mixture."

{¶28} A trace evidence expert from the Cuyahoga County Medical Examiner's Office testified that both of the victim's hands showed "no reaction" when tested for "trace metal detection," indicating no evidence that the victim's hands were exposed to "metal surfaces on an object like a knife * * *."

**{¶29}** Parker next argues that "there is not a plan on [his] part to go over to the house with the intention to murder anybody." Parker testified that after the victim "challenged" him to come to Suttles's house, he was "pissed off" and he "wanted to go and confront [the victim]." Parker stated that he brought the knife "for protection" from the victim. However, it is long-standing law in Ohio that intent to kill may be inferred when a deadly weapon is used.

> The accepted rule that a person must be held to intend the natural and probable consequences of his act evolved from cases dealing with the use of dangerous weapons and instrumentalities, such as guns, knives, clubs and other lethal objects. A person using such deadly and destructive objects is held, under the law, to intend the natural and probable consequences resulting from the manner in which such objects were used.

*State v. Butler*, 11 Ohio St.2d 23, 24, 227 N.E.2d 627 (1967).

**{¶30}** In summary, the forensic evidence presented at trial does not support Parker's testimony that the victim was holding the knife at issue in this case. Therefore, the weight of the evidence is not in favor of Parker's self-defense argument. Additionally, we cannot say that the court lost its way when it found that Parker purposefully caused the death of the victim. Accordingly, Parker's second assigned error is overruled.

## Self-Defense

**{¶31}** In his third assigned error, Parker argues that the trial court erred when it convicted him, because he acted in self-defense.

**{¶32}** To establish self-defense, defendants must show that: 1) they were not at fault in creating the situation; 2) they had a reasonable belief that they were in imminent danger of death or great bodily harm, and the only means of escape was the use of force; and 3) they did not violate a duty to retreat or avoid the danger. *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990).

{¶33} "[I]ssues concerning the weight given to the evidence and the credibility of witnesses are primarily for the trier of fact." *State v. Yarbrough*, 104 St.3d 1, 16, 2004-Ohio-6087, 817 N.E.2d 845.

{¶34} Parker testified that he grabbed the knife by the blade to get it out of the victim's hands, and because he was scared for his life, Parker stabbed the victim five times. The forensic evidence does not support Parker's testimony that the victim was, at some point, holding the knife. Additionally, it is somewhat incredible to believe that Parker stabbed the victim while holding the knife by the blade, which is what Parker testified to in open court.

{¶35} After the incident, Parker ran down the street and called 911. According to an audiotape of Parker's 911 call, Parker stated the following to the 911 operator: "I had a knife and [the victim] took it out of my fucking hands and pocket." Additionally, an eyewitness who encountered Parker as he was running down the street immediately after the incident testified that Parker stated that he had gotten into a fight and cut his hand.

{¶36} Upon arrival at scene of the crime, Cleveland Police Officer Shawn Huff observed Parker "walking in the street with a towel around his hand that appeared to be covered in blood." Parker approached one of the police cars and told Officer Huff that he "got in a brief struggle" with the victim and "somehow [the victim] got stabbed." Parker told Officer Huff that he did not know how the victim got stabbed. Although Officer Huff saw that Parker's hand was bleeding "a decent amount," Parker did not say anything about grabbing the blade of the knife or otherwise injuring his hand.

{¶37} Parker told Officer Huff that he brought the knife to Suttles's house "for protection," and "it fell out of his pocket during the fight." According to Officer Huff, Parker then stated that "he was sorry he did it, he had to do it."

**{¶38}** Subsequently, Parker gave a statement to two Cleveland police detectives. Parker told them that Suttles had invited him to her house that night, and he was surprised to find the victim there. Parker also told the detectives that the victim "produced a knife from his back pocket and attempted to attack him with the knife." Parker later changed his story when he learned that the detectives knew Parker brought the knife with him and Parker knew he was not supposed to be at Suttles's house.

**{¶39}** Asked why he lied to the police, Parker answered as follows:

A.      I thought I could get away with it, but —

Q.      Get away with what?   Get away with murder?

A.      No.

Q.      Get away with what?

A.      I was just trying to get away from the situation.

**{¶40}** The following colloquy occurred during Parker's cross-examination:

Q.      You told [defense counsel on direct examination] that you lied to the detectives in your interview because you just wanted to get away with it.   Do you remember testifying to that?

A.      Yes.

Q.      What were you trying to get away with, Mr. Parker?

A.      Nothing.

**{¶41}** Furthermore, the state established that Parker made multiple inconsistent statements about the events that occurred on June 10, 2014: one version to the 911 operator; another version to the police and medical staff at the hospital; another version to the detectives originally; another version to the detectives after Parker learned that they had more information than he thought; and another version as a witness at his trial.   Parker admitted to all the versions.   Asked which version of the events the court should believe, Parker answered, "I can't recall."

**{¶42}** The evidence presented at trial showed that Parker and the victim both played a part in creating the situation that led to the stabbing. Parker's testimony that the victim had the knife at some point during their fight is uncorroborated. There was no testimony at trial that Parker's only means of escape was by the use of force. In fact, Parker testified at trial that the victim told him to "get the fuck out of" Suttles's house when Parker arrived. Furthermore, Parker told the police detectives that "he should have stayed home and he wouldn't be in this trouble right now."

**{¶43}** Upon review, we cannot say that the court erred in rejecting Parker's self-defense theory, as he failed to present convincing evidence regarding all three prongs of the self-defense test articulated in *Williford,* 49 Ohio St.3d 247, 551 N.E.2d 1279. Parker's third assigned error is overruled.

## Compatibility of Voluntary Manslaughter and Self-Defense Instructions

**{¶44}** In his fourth assigned error, Parker argues that the trial court erred in considering the lesser included offense of voluntary manslaughter when self-defense was also at issue.

**{¶45}** "[A]n instruction on voluntary manslaughter and self-defense is not possible because the two legal theories are incompatible." *State v. Williamson*, 8th Dist. Cuyahoga No. 95732, 2011-Ohio-4095, ¶ 36. "[V]oluntary manslaughter requires that the defendant be under the influence of sudden passion or a fit of rage, while self-defense requires the defendant to be in fear for his own personal safety." *Id.*

**{¶46}** The case at hand differs materially from *Williamson*. The issue in *Williamson* was the defendant's argument on appeal that the trial court erred by refusing to instruct the jury on self-defense. However, this court found that "the trial court properly denied [the defendant's] request to give * * * a self-defense instruction," because defense counsel also requested a voluntary manslaughter instruction at trial. *Id.* at ¶ 37.

{¶47} The case at hand was tried to the bench; therefore, jury instructions are not at issue. Additionally, prior to the court issuing its verdict, defense counsel and the prosecutor went on the record and stipulated to the various legal theories the court would consider under Count 1 — aggravated murder, murder, reckless homicide, and voluntary manslaughter — in addition to the notion of self-defense, if applicable. As such, Parker waived all but plain error under this argument. *See State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.2d 1023, ¶ 137 (failure to object at trial waives all but plain error).

{¶48} To reverse under a plain error standard, an appellate court must find "an 'obvious' defect in the trial proceedings [that] affected the outcome of the trial." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). *See also* Crim.R. 52(B). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978).

{¶49} The court convicted Parker of the lesser included offense of murder under R.C. 2903.02(A) in Count 1 of the indictment. We find that this conviction is supported by the evidence. Therefore, we decline to find plain error in the court's considering the incompatible theories of voluntary manslaughter and self-defense. Parker's fourth assigned error is overruled.

### Voluntary Manslaughter

{¶50} In Parker's fifth assigned error, he argues that "the trial court erred in considering the lesser included offense of voluntary manslaughter when there was no evidence of sudden passion or sudden fit of rage on the part of appellant."

{¶51} As stated under Parker's fourth assigned error, the parties and the court agreed to the offenses the court would consider in the alternative to aggravated murder under Count 1.

Voluntary manslaughter was one of these offenses. Therefore, Parker waived all but plain error upon review.

**{¶52}** Voluntary manslaughter is defined as follows: "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *."   R.C. 2903.03(A).

**{¶53}** "In a bench trial, a trial court is presumed to know the law and to have considered lesser included offenses supported by the evidence."   *State v. Ellis*, 8th Dist. Cuyahoga No. 99830, 2014-Ohio-116, ¶ 46. Additionally, under "well-established Ohio law it is ordinarily presumed that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appeared to the contrary." *Id.* at ¶ 54.

**{¶54}** In the case at hand, although the court considered voluntary manslaughter, Parker was not convicted of it, and we cannot see how the court's consideration was prejudicial or deprived Parker of a fair trial.   Parker's fifth assigned error is without merit.

### Effective Assistance of Counsel

**{¶55}** In his sixth and final assigned error, Parker argues that he was denied effective assistance of counsel when his attorneys requested that the trial court consider the lesser charge of voluntary manslaughter while also considering self-defense.

**{¶56}** To succeed on a claim of ineffective assistance of counsel, a defendant must establish that his or her attorney's performance was deficient and that the defendant was prejudiced by the deficient performance.  *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).   However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.

The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* at 697. *See also State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 3743 (1989).

**{¶57}** In Parker's fifth assigned error, we found that he suffered no prejudice as a result of any error the court may have committed in considering the charges of voluntary manslaughter and self-defense. Parker's convictions are supported by the weight of the evidence, and we find no merit to his argument that but for his counsel's performance, he would have been acquitted of the death of the victim. Accordingly, Parker's sixth assigned error is overruled.

**{¶58}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, JUDGE

MARY EILEEN KILBANE, P.J., and
MARY J. BOYLE, J., CONCUR


## APPENDIX

Assignments of Error

I.      The trial court erred in denying appellant's motion for acquittal as to the charges when the state failed to present sufficient evidence against appellant.

II.     Appellant's convictions are against the manifest weight of the evidence.

III.    The trial court erred by finding appellant guilty although appellant acted in self-defense.

IV.     The trial court erred in considering the lesser included offense of Voluntary Manslaughter as this Honorable Court has previously held that an instruction on voluntary manslaughter and self-defense is not possible because the two legal theories are incompatible.

V.      The trial court erred in considering the lesser included offense of Voluntary Manslaughter when there was no evidence of sudden passion or sudden fit of rage on the part of appellant.

VI.     Appellant was denied effective assistance of counsel as guaranteed by Section 10, Article I, of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution when counsel requested that the trial court consider the lesser charge of voluntary manslaughter while also considering self-defense.